# 14 CV 8330

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

TRAVIS OSTROVIAK, Individually and on Behalf of All Others Similarly Situated,

                    Plaintiff(s),

v.

MILLENNIAL MEDIA, INC., PAUL J. PALMIERI, MICHAEL B. AVON, ANDREW J. JEANNERET, and MICHAEL BARRETT,

                    Defendants.

No.:

CLASS ACTION



RECEIVED OCT 17 2014 U.S.D.C. S.D. N.Y. CASHIERS

DEMAND FOR JURY TRIAL

---

## COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff Travis Ostroviak ("Plaintiff"), individually and on behalf of all other persons similarly situated, by her undersigned attorneys, for her complaint against defendants, alleges the following based upon personal knowledge as to herself and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through her attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Millennial Media, Inc. ("Millennial Media" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   NATURE OF THE ACTION

1.   This class action is brought pursuant to the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of all persons or entities who, between March 28, 2012 and May 7, 2014, inclusive (the "Class Period"), purchased or otherwise acquired the securities of Millennial Media (the "Class"). The claims allege that Defendants (defined herein) engaged in a fraudulent scheme to artificially inflate the price of Millennial Media's stock during the Class Period.

2.   On or about March 28, 2012, Millennial Media commenced its initial public offering (the "IPO") through which the Company and certain of its shareholders sold more than 11.7 million shares (including the full exercise of an underwriters' option) at $13.00 per share for aggregate gross proceeds of more than $152 million. Through a second stock offering, commenced on or about October 24, 2012 (the "Secondary Offering" and together with the IPO, the "Offerings"), Millennial Media and certain of its shareholders sold an additional 11.5 million shares of Company stock (including the full exercise of an underwriters' option) at $14.15 per share for aggregate gross proceeds of more than $162 million.

3.   The Exchange Act claims asserted herein arise from a series of false statements of material fact and omissions of material adverse information, made by Defendants in connection with the IPO and Secondary Offering and throughout the Class Period, about the development of the Company's technology, its ability to accurately track and report critical commercial metrics, the rationale for and progress of certain corporate acquisitions, and Millennial Media's future prospects. The ultimate disclosure of the truth about the Company caused a precipitous decline in the market value of the Company's common stock, resulting in significant losses and damages to Plaintiff and the Class.

## II.     FACTUAL OVERVIEW AND SUMMARY OF ALLEGATIONS

4.      Millennial Media is a digital advertising company that provides advertising services focused on the mobile computing segment, such as smartphones that run Apple, Inc.'s iOS operating system, Google, Inc.'s Android operating system, or other operating systems.

5.      The Company provides its services to developers and advertisers. Key to Millennial Media's success in this industry is that its technology provides an easy and effective way for developers of applications for mobile devices to integrate the Company's advertising mechanism into their software, and track and generate accurate reports of results for advertisers' campaigns.

6.      Prior to Millennial Media's IPO and throughout the Class Period, the Company touted its proprietary technology and data platform, referred to as "MYDAS," as a solution for both application developers and advertisers insofar as MYDAS and its component services allowed for both: (1) the easy and effective integration of Millennial Media advertising into mobile applications by developers; and (2) the flexible targeting and accurate reporting of advertising campaigns for advertisers. Millennial Media also claimed that the features and performance of its MYDAS platform were drawing customers and that its strategic acquisitions were enhancing the Company's existing capabilities.

7.      The true facts were as follows:

(a)      technological products and services crucial to the Company's business model were not fully functional, but, in fact, were still in nascent stages when announced, leading to rushed, slipshod programming, poor performance, and failure;

3

(b)    the Company had little meaningful ability to track and report end-user clicks, leading to significant over-billing, which in turn led the Company's core customers to abandon Millennial Media;

(c)    corporate acquisitions that Millennial Media undertook during the Class Period did not offer the business synergies claimed by the Company, but were rather undertaken to fill gaping holes in the Company's capabilities;

(d)    corporate acquisitions that Millennial Media undertook during the Class Period were misrepresented as progressing well through integration, when, in fact, the Company faced insurmountable integration challenges stemming from its own prior rushed and slipshod development; and

(e)    Defendants' statements regarding the outlook and prospects of the Company were materially false at all relevant times.

8.    On February 19, 2013, after the close of the markets, the Company issued a press release announcing revenue for the fourth quarter of 2012 of $58 million-sharply below analysts' expectations of $62.9 million. Millennial Media also gave disappointing revenue guidance for 2013 and disclosed that it would acquire Metaresolver Inc. ("Metaresolver"). Millennial Media's poor results, weak guidance, and its need to acquire Metaresolver arose out of ongoing problems with the Company's then-existing technologies, such as the MYDAS platform's inability to provide accurate and reliable records of end-users clicks and actions, which were driving clients away. In response to this partial disclosure of the true state of the Company's proprietary software and related technologies, Millennial Media's stock price fell $5.38 per share, or 37.54 percent, to close at $8.95 per share on February 20, 2013.

9.     Then, on August 13, 2013, Millennial Media issued a press release announcing that the Company would acquire Jumptap, Inc. ("Jumptap") in a substantially all-stock transaction that then valued Jumptap at more than $200 million. Further, in connection with reporting its results for the prior quarter, the Company declined to offer revenue guidance for the coming quarter or an update to its guidance for the full year in the expected manner. Millennial Media's need to acquire Jumptap, whose technology centered around programmatic advertising for performance-based advertising-services that the Company claimed its MYDAS platform already provided-was the result of the Company's ongoing problems with its technologies. In response to this partial disclosure of the weaknesses in the Company's proprietary software and related technologies, Millennial Media's stock price fell $1.60 per share, or 18.82 percent, to close at $6.90 per share on August 14, 2013.

10.     Later, on November 13, 2013, after the markets had closed, the Company issued a press release announcing disappointing results for the third quarter of 2013 and unexpectedly downcast guidance for the fourth quarter. In response to this partial disclosure of the continued erosive effect of unresolved weaknesses in the Company's proprietary software and related technologies on the Company's ability to generate revenue, Millennial Media's stock price fell $0.86 per share, or 11.98 percent, to close at $6.32 per share on November 14, 2013.

11.     Then, on February 19, 2014, after the markets had closed, the Company issued a press release revealing disappointing revenue guidance for the first quarter of 2014 of between $72 million and $76 million-far below analysts' expectations of $83 million-and weak guidance for 2014 earnings before interest, taxes, depreciation and amortization ("EBITDA") of between -$5 million and -$6 million, which sharply diverged from analysts' expectations of +$8.8 million. Millennial Media also revealed that, based on the then-current state of its technology, it could not

expect to achieve earlier growth projections, or even match the growth rate of other firms in its industry. In response to this partial disclosure that the Company's proprietary software and related technologies would require significant additional investment and development and were not ameliorated by the Company's costly corporate acquisitions, Millennial Media's stock price fell $1.05 per share, or 14.58 percent, to close at $6.15 per share following the next trading session on February 20, 2014.

12.     Finally, on May 7, 2014, after the markets had closed, Millennial Media issued a press release reporting revenue for the first quarter of 2014 below analysts' projections and dour revenue guidance for the coming quarter of between $70 million and $75 million, well below analysts' projections of $96.4 million. Additionally, the Company revealed that its Chief Financial Officer, Michael B. Avon ("Avon"), would step down from his role as of July 1, 2014 to "pursue other career interests." In response to the disclosure of the true state of the Company's competitive position, low revenue visibility, poor outlook for growth and the deleterious effects of its weak and underdeveloped technology on its prospects, Millennial Media's stock price fell $1.99 per share, or 37.20 percent, to close at $3.36 per share following the next trading session on May 8, 2014.

13.     As a result of Defendants' materially false and/or misleading statements and omissions: (1) Millennial Media's common stock was offered at artificially inflated prices; and (2) Millennial Media's common stock traded at inflated prices during the Class Period. However, as the truth about Millennial Media's operations and outlook became known to investors, the artificial inflation came out and the price of Millennial Media's common stock fell, declining by 86.56 percent from its Class Period high. These price declines caused significant losses and damages to Plaintiff and other members of the Class.

6

### III. JURISDICTION AND VENUE

14. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.P.R. § 240.10b-5.

15. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

16. Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b). The Company conducted its IPO and Secondary Offering in this District and many of the acts that constitute the violations of law complained of herein, including dissemination to the public of materially false and misleading information to the investing public in connection with those transactions, occurred in and/or were issued from this District.

17. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

### IV. PARTIES

18. As set forth in the attached certification, Plaintiff purchased Millennial Media stock at artificially inflated prices during the Class Period and has been damaged thereby.

19. Defendant Millennial Media is a corporation that is organized in Delaware and maintains its principal executive offices at 2400 Boston Street, Suite 201, Baltimore, Maryland. Millennial Media completed offerings of its common stock through the IPO and Secondary Offering on the New York Stock Exchange (the "NYSE"), where its common stock trades under the ticker symbol "MM."

20.     Defendant Paul J. Palmieri ("Palmieri") was, at all relevant times prior to January 25, 2014, President and CEO of Millennial Media, and a member of the Company's Board of Directors. During the Class Period, CEO Palmieri certified the Company's periodic financial reports filed with the SEC and spoke with investors and securities analysts regarding the Company on a regular basis.

21.     Defendant Avon was the Executive Vice President and CFO of Millennial Media from November 2009 to June 30, 2014. During the Class Period, CFO Avon certified the Company's periodic financial reports filed with the SEC and spoke with investors and securities analysts regarding the Company on a regular basis.

22.     Defendant Andrew J. Jeanneret ("Jeanneret") is the Senior Vice President and CAO of the Company. During the Class Period, CAO Jeanneret spoke with investors and securities analysts regarding the Company on a regular basis.

23.     Defendant Michael Barrett ("Barrett") has been, at all relevant times since January 25, 2014, President and CEO of the Company, and a member of the Company's Board of Directors.

24.     Defendants described in paragraphs 24 through 27 are collectively referred to herein as the "Individual Defendants." The Individual Defendants, together with Defendant Millennial Media, are collectively referred to herein as the "Defendants."

## V.     SUBSTANTIVE ALLEGATIONS

### A.     Relevant Background

25.     Millennial Media is a mobile advertising platform company that, through its proprietary software systems and related technology, seeks to offer an effective means for advertisers to run promotional campaigns on mobile computing devices, such as smartphones

8

and tablets. Millennial Media's technology was portrayed as offering two critical selling points: (1) its ability to provide an easy method for developers of applications for mobile devices to integrate the Company's advertising mechanism into their software; and (2) its ability to track and generate accurate reports of results for advertisers' campaigns.

26.     Although Millennial Media reports its operations In a single, undifferentiated business segment, the Company's operations are divided among two highly distinct types of advertisements: (1) "brand advertisements" intended only to be displayed before an audience; and (2) "performance advertisements" intended to spur audience members to engage in some action, such as clicking on the advertisement or downloading a file.

27.     Brand advertisements are generally sold on the basis of a cost per 1,000 impressions ("CPM"), while performance advertisements are generally sold on the basis of a cost per click ("CPC") or a cost per action ("CPA").

28.     Prior to Millennial Media's IPO and throughout the Class Period, the Company touted the MYDAS platform and its components as a solution for both application developers and advertisers insofar as MYDAS and its component services allowed for both: (1) easy integration of Millennial Media advertising into mobile applications by developers; and (2) flexible targeting and accurate reporting of advertising campaigns for advertisers.

**B.     Materially False and Misleading Statements**

29.     On January 5, 2012, Millennial Media filed a Form S-1 registration statement with the SEC in connection with the Company's contemplated IPO. The Company filed five amended versions of the registration statement between February 10 and March 27, 2012 (as amended, the "IPO Registration Statement").

30.     On March 28, 2012, the first day of the Class Period, Millennial Media's IPO

Registration Statement was declared effective and the Company finalized its completed

prospectus in connection with the IPO (the "IPO Prospectus" and together with the IPO

Registration Statement, the "IPO Documents").

31.     As set forth in the IPO Prospectus, Millennial Media registered 10.2 million

shares of common stock plus an underwriters' over-allotment option for an additional 1,530,000

shares to be offered to the public at $13.00 per share.  The IPO Documents included descriptions

of the Company and its competitive strengths. For example, the IPO Prospectus stated:

> Our [proprietary technology and data platform, known as
> MYDAS] is specifically architected to deliver mobile advertising
> at scale, rather than applying traditional online advertising
> technology or focusing on particular mobile operating systems. . . .
> .*Our platform is capable of accounting for, and efficiently
> analyzing, variables such as wireless connection strength, device
> operating system and audience profile in real-time* in order to
> decide which ad to send in response to a specific ad request from
> an app.

*     *     *

> *We offer developers sophisticated reporting and analytics
> through an integrated dashboard on our mmDev portal, which
> includes comprehensive ad revenue generation reports for their
> apps across all major mobile operating systems*. These reports
> help developers gain insight into user interaction and behavior and
> the performance of their apps. We share this performance data with
> developers to help them improve their apps and 'heir deployment
> of our [software developers' kits, or "SDK"s] in order to maximize
> their ad revenue. In addition, through the more than 1.5 billion ad
> requests that we typically receive each day, we are able to gain
> important insights about users that we are able to share with
> developers on an aggregated basis.

*     *     *

> We help developers and advertisers remove complexity from
> mobile advertising. By working with us, developers gain access to
> our tools and services that allow their apps to display banner ads,
> interactive rich media ads and video ads from our platform. In

return, developers supply us with space on their apps to deliver ads for our advertiser clients and also provide us with access to anonymous data associated with their apps and users. *We analyze this data to build sophisticated user profiles and audience groups that, in combination with the real-time decisioning, optimization and targeting capabilities of our technology platform, enable us to deliver highly targeted advertising campaigns for our advertiser clients*.

\*     \*     \*

After MYDAS identifies the unique user associated with a specific ad request, the context around the ad request and the audiences to which the user belongs, *MYDAS delivers the request to a realtime, bidded marketplace in which it matches available ads with available ad requests. MYDAS performs a sophisticated statistical analysis to automatically run an instantaneous virtual auction in which each qualified ad campaign bids on each available ad request*. We call this process optimization and decisioning. . . . When MYDAS enters an ad request into the marketplace, each agent bids on the ad request, and the platform then matches the best available ad to the specific ad request.

(All emphases are added unless otherwise noted.)

32.     On March 29, 2012, prior to the opening of the markets, Millennial Media filed the effectiveness order for the IPO Registration Statement and filed its IPO Prospectus pursuant to Rule 424(b)(4) with the SEC. Trading in Millennial Media shares commenced on the NYSE on March 29, 2012. The Company's stock price rose $12.00, or 92.31 percent, to close at $25.00 per share during the trading session that day.

33.     On May 14, 2012, after the markets had closed, the Company issued a press release announcing its results of operations for the first quarter of 2012. The Company reported total revenue of $32.9 million, gross margin of 39.5 percent, and 300 million monthly unique users worldwide. The Company also offered revenue guidance for: (1) the second quarter of between $37 million and $38 million; and (2) the full year 2012 of between $173 million and $176 million.

34.     In connection with these results, CEO Palmieri stated:

> Our first quarter performance exceeded expectations with strong year over year revenue growth, as well as expansion in the numbers of unique users and apps on the Millennial Media platform. We're excited that we became a public company during the first quarter, which significantly increased our market awareness and resources to execute our long-term growth strategy and investments. We are aggressively investing given we are still in the early stages of a large and rapidly growing mobile advertising market. As a market leader, *we believe Millennial Media is well-positioned to drive the business model of the worldwide app economy*.

35.     At or about the same time, Millennial Media hosted a conference call for investors and analysts to discuss these results. As part of his prepared remarks, CEO Palmieri stated:

> [W]e are very excited about our Q1 performance. We've aggressively made the investments we said we were going to make, and we've done it more efficiently than was our goal.

*          *          *

> We designed MYDAS for the mobile environment, where the delivery and targeting of ads must allow for a much greater number of variables than in traditional online advertising. When an ad request comes to the system, *MYDAS accounts for and analyzes hundreds of variables in real time. The system* uses our own anonymous identifier; appends profile, location, usage and audience data; and *operates a realtime marketplace to determine ad placement*. We then use our technology to handshake with our SDK software that developers have already embedded in their apps to determine and execute the best display of the ad within the app for mobile site.

Later, during the question-and-answer portion of the conference call, CFO Avon engaged in the following exchange:

> **[Analyst]**: You guys talked about some of the strengths on the pricing side. You would expect some seasonality as far as [effective cost per thousand impressions, or "eCPMs"] but should we think about, on a year-over-year basis, pricing being-again this is a factor of the fill rate or what not, but should we think about

lower eCPMs on a year-over-year basis for QI and going forward directionally?

**CFO Avon:** I'll answer that question *as we answered it in the IPO road show*. The way to think about pricing, you really have to segment out the business into brand advertising, particularly highly-targeted and highly-engaging ads. In which case we've continued to see increases in pricing on the most-engaging and the most highly-targeted ads. The more performance ads, or the less targeted ads that we see, or the less engaging ads that we see, you do see prices move up and down. That's driven somewhat by seasonality, overall driven by supply and demand. No long-term discernible trends in the business to date, right now. But *overall there is a mix shift towards more targeted and more engaging ads, which over time have driven prices up for us*.

36.    Equity analysts incorporated these positive statements relating to Millennial Media's technology platform, the mobile industry's adoption of the Company's systems, and the Company's positive outlook into their optimistic recommendations. For example, on May 14, 2012, Morgan Stanley issued a report entitled *Millennial Media, Inc. CQ1:2012: A Great Start,* which stated in part:

**Our take**: MM's 1Q outperformance across revenue, gross margin, and EBITDA metrics underscores *our belief that MM delivers market-leading ad targeting capabilities to advertisers and superior monetization to developers*. At a closing price of $15.45, our risk/reward view improves relative to our May 8 report *"A Pure Play on Mobile Advertising, but Upside May Be Priced In"*.

37.    On May 15, 2012, prior to the opening of the markets, Millennial Media filed its quarterly report on Form 10-Q with the SEC, which included substantially similar financial results as those set forth in the Company's earlier press release.

38.    The Company's Form 10-Q included a certification signed by CEO Palmieri, incorporated therein as Exhibit 31.1, which stated:

I, Paul J. Palmieri, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q of Millennial Media, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

> a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period III which this report is being prepared;

> b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

> c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

> d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the

14

registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

The Company's Form 10-Q also included a substantially similar certification, signed by CFO Avon, as Exhibit 31.2.

39. On August 8, 2012, after the markets had closed, the Company issued a press release announcing its results of operations for the second quarter of 2012. The Company reported total revenue of $39.4 million, gross margin of 39.7 percent, and more than 350 million monthly unique users worldwide. The Company also offered revenue guidance for: (1) the third quarter of between $43.5 million and $45 million; and (2) the full year 2012 of between $176 million and $179 million.

40. In connection with these results, CEO Palmieri stated:

We delivered strong revenue growth of 76% year over year, along with expanded gross margin performance and improved operating leverage in the second quarter. We now have over 35,000 enabled apps on our mobile advertising platform, which *we believe underscores the compelling value proposition we bring to our developer partners*. During the quarter, we also grew our base of advertising clients who rely on us to deliver targeted audiences for

15

high impact campaigns across a broad range of mobile devices. With our large and growing data asset, along with a targeted approach that harnesses the unique capabilities of mobile devices, we continue to power the app economy, both domestically and increasingly into new international markets.

41.     At or about the same time, Millennial Media hosted a conference call for investors

and analysts to discuss these results. As part of his prepared remarks, CEO Palmieri stated:

Our performance in the period reflects the positive momentum we've established in the mobile advertising market. As the industr[y']s leading independent provider, *we are positioned for continued growth and market share gains on the strength of our scale, our differentiated technology platform, our advanced targeting capabilities, based on this large and growing data asset, and our deep integrations and relationships with app developers and advertisers alike*. At Millennial Media we are singularly focused on delivering superior results in the market and to our clients.

Mobile is all that we do and we have differentiated scale in that market. It is because of the years of this singular focus that we are succeeding in mobile monetization where others are not. *We have built the technologies and products that solve for the complexities and challenges inherent in mobile*, while also taking advantage of an entirely new opportunity presented by mobile.

*              *              *

With our proprietary MYDAS technology and our large and growing data assets, we are able to build real world audiences from mobile specific data such as location data or point of sale data. We use that data to better target [ads] to the right people at the right time, so that they are more likely to engage with that ad. And once a campaign has run, *we are able to provide increasingly more comprehensive analytics and insights*, enabling them to develop even more effective campaigns in the future on our platform.

Later, during the question-and-answer session, CEO Palmieri and CFO Avon engaged in the

following exchange:

[**Analyst**]: Do you believe you're gaining share or do you think you're growing at about the rate of mobile advertising market growth?

16

> **CEO Palmieri**: I think we're ahead of the market growth, so I do think that we continue to take share. Mike might have a comment more specifically, but we think we're ahead of where the market is growing.
>
> **CFO Avon**: That's right, [Analyst]. As you know, most of the market share data comes out on an annual basis but we believe, as best as we can tell, we're growing at a rate faster than the market and have continued to do so.

42.      On August 9, 2012, prior to the opening of the markets, Millennial Media filed its quarterly report on Form 10-Q with the SEC, which included substantially similar financial results as those set forth in the Company's earlier press release. The Company's Form 10-Q also included certifications substantially similar to those described in paragraph 38.

43.      On August 15, 2012, CFO Avon conducted a presentation in connection with Canaccord's Global Growth Conference. As part of his prepared remarks, CFO Avon stated:

> [A]ll the features from the SDK enable a compelling interactive user experience with ads. We have a suite of tool sets that are embedded in a self-service business management system to allow developers to run their business. This includes tools like mediation, that allow developers to allocate ad requests among various campaign sources; the ability to serve their own sold campaigns, or to run house ads or cross promote their apps throughout our platform.
>
> And then *we offer sophisticated reporting and analytics for developers through an integrated dashboard. Our deep level of technical integration with apps across our platform drives our ability to deliver rich, differentiated ad experiences to advertisers. Advertisers use our platform to reach[,] target and engage specific audiences of consumers via apps on the platform*.

44.      Analysts incorporated Millennial Media's statements into their assessments of the Company's technology and their optimistic projections for the Company's outlook. For example, on September 11, 2012, Canaccord issued a report covering Millennial Media entitled *Upbeat Management Meetings; Sound Competitive Position,* which noted in part:

> **Key Points**

17

> • *We believe business trends remain strong for the long term*, and we note potential for Q3 and Q4 to show upside based on seasonal factors including election ad spending, shift to higher mix of brand advertising, and Apple device launches.
>
> • We believe that Millennial's model *offers more forecasting visibility* than would appear at first glance, and that *the risk of a miss in the short term appears low*.

45.     On October 15, 2012, Millennial Media filed a Form S-1 registration statement with the SEC in connection with the Company's contemplated Secondary Offering. The Company filed an amended version of this registration statement on October 18, 20 12 (as amended, the "Secondary Offering Registration Statement").

46.     On October 23, 2012, the Secondary Offering Registration Statement was declared effective and the Company finalized its completed prospectus in connection with the Secondary Offering (the "Secondary Offering Prospectus" and together with the Secondary Offering Registration Statement, the "Secondary Offering Documents").

47.     As set forth in the Secondary Offering Prospectus, Millennial Media registered 10 million shares of common stock plus an underwriters' over-allotment option of an additional 1.5 million shares to be offered to the public at $14.15 per share. The Secondary Offering Documents included descriptions of the Company and its competitive strengths. For example, the Secondary Offering Prospectus stated:

> We enable advertisers to gain insights into the performance of their ad campaigns and to manage their campaigns with a view to maximizing return on their advertising investment. *Our solutions are designed to address the needs of large brand advertisers and advertising agencies as well as smaller, performance-based advertisers*. Large brand and performance advertisers typically buy ads on our platform through our sales teams. Smaller advertisers typically buy ads either through our inside sales team or through our mMedia self-service advertising portal.

*     *     *

As a result of the amount and nature of the data we collect through our platform, ***our reporting to advertisers goes beyond traditional post-campaign analysis to provide actionable insights for current ad campaigns and future marketing strategies. We offer realtime reporting and analytics to help advertisers understand why some campaigns perform better than others.***

***Our self-service interface also enables advertisers to plan and alter live campaign parameters, such as audience targeting and pricing.*** We also give our larger advertisers the option to work directly with our advertising account specialists, who help our clients manage their ad campaigns.

\* \* \*

After MYDAS identifies the unique user associated with a specific ad request, the context around the ad request and the audiences to which the user belongs, ***MYDAS delivers the request to a realtime, bidded marketplace in which it matches available ads with available ad requests. MYDAS performs a sophisticated statistical analysis to automatically run an instantaneous virtual auction in which each qualified ad campaign bids on each available ad request.*** We call this process optimization and decisioning. . . . When MYDAS enters an ad request into the marketplace, each agent bids on the ad request, and the platform then matches the best available ad to the specific ad request.

48.     On October 24, 2012, prior to the opening of the markets, Millennial Media filed the effectiveness order for the Secondary Offering Registration Statement and filed its Secondary Offering Prospectus pursuant to Rule 424(b)( 4) with the SEC.

49.     On November 5, 2012, after the markets had closed, the Company issued a press release announcing its results of operations for the third quarter of 2012. The Company reported revenue of $47.4 million, gross margin of 40.9 percent, and more than 380 million monthly unique users worldwide. The Company also offered revenue guidance for: (1) the fourth quarter of between $61.5 million and $63 million; and (2) the full year 2012 of between $181 million and $182.5 million.

50.     In connection with these results, CEO Palmieri stated:

As previously announced, we delivered accelerated revenue growth for the third quarter along with strong gross margin performance. Our comprehensive suite of advertising solutions continues to be sought after by more and more brand advertisers looking to use a proven mobile platform to achieve their marketing objectives. During the quarter, we also continued to build on our leadership position with investments in technology and other resources as well as in the expansion of our international operations to accommodate both global and more regional demand for our platform.

51.     At or about the same time, Millennial Media hosted a conference call for investors and analysts to discuss these results. As part of his prepared remarks CEO Palmieri stated:

Our strong results for the period, along with our increased full year outlook, speak to the traction we've established as the go to provider of mobile monetization solutions. ***There's been a lot of discussion in the media lately about a mobile monetization problem. From our perspective and as reflected in these financial results, there is no mobile monetization problem, just the growing opportunity for Millennial Media to capitalize on.***

                    *          *          *

***Performance advertisers, such as app developers who want to drive downloads of their apps, use our platform*** to reach and target customers who will generate positive lifetime value for them. Lifetime value, or LTV, is a specific financial metric used by performance advertisers to determine the difference between the cost to drive a download and the revenue generated from that download over the lifetime of that app's usage by a single consumer. ***Because we are able to deliver this long-term value-or lifetime value, by quality downloads in[] addition to the quantity of downloads, we have become an invaluable source for delivering differentiated value for this segment of our advertiser base.***

Later, during the question-and-answer portion of the conference call, CFO Avon engaged in the following exchange:

**[Analyst]**: [I w]ould love to get your thoughts on real-time bidding as it relates to the mobile industry, specifically where are we currently in terms of adoption and how do you kind of see that evolving over the next 12 months or so?

> **CFO Avon**: Yes, you're hearing a lot about real-time bidding [("RTB")] in mobile. 1 think it's still the very early days for RTB and mobile. There are few companies out there that are starting to put offerings out in the market. 1 think it's still some time before you see broad adoption of RTB and in mobile given the complexities on the supply side of mobile, the many different devices and capabilities of the devices. But all that said, *we run a real-time bidded exchange within our core platform internally and over the long term, we think we're very well positioned if the market moves to real-time bidding*. But I think it's early days today. It's a very small percentage of the market and we'll see how it increases from there.

52.     On November 6, 2012, prior to the opening of the markets, Millennial Media filed its quarterly report on Form 10-Q with the SEC, which included substantially similar financial results as those set forth in the Company's earlier press release. The Company's Form 10-Q also included certifications substantially similar to those described in paragraph 38.

### C.     The Truth Begins to Emerge

53.     On February 19, 2013, after the close of the markets, the Company issued a press release announcing its results of operations for the fourth quarter and full year of 2012. The Company reported revenue in the fourth quarter of $58 million-sharply below analysts' expectations of $62.9 million-as well as gross margin of 41.2 percent, and more than 400 million monthly unique users worldwide. The Company's full-year results included revenue of $177.7 million and gross margin of 40.5 percent. The Company also offered disappointing revenue guidance for: (l) the first quarter of 2013 of between $48 million and $50 million; and (2) the full year 2013 of between $270 million and $280 million.

54.     In connection with these results, CEO Palmieri stated:

> *Our success in 2012 speaks to the effectiveness of our platform model in delivering highly targeted and compelling mobile advertising solutions*. We delivered 68% revenue growth with record profitability in the fourth quarter. Mobile advertising is still in its early stages of development, and we believe its tremendous growth

21

potential will transform digital advertising. As a native mobile company, we are excited about our leadership position in the market and our business prospects in 2013.

55.     In connection with the earnings release, Millennial Media hosted a conference call

to discuss its results with analysts and investors. As part of his prepared remarks, CEO Palmieri

stated in part:

[A]s we conduct this call today, there is no question Millennial Media is the leading independent platform in the Mobile Advertising business and powering the app economy. ***There now also can be no doubt that our model is proven and strong. Our platform is having success and our investments in technology and data are delivering the solutions that show marketers the power and value of mobile.***

\*          \*          \*

[W]e have some choices that we made in Q4 consistent with our long-held strategy on whether to chase some business in some performance segments or to continue to focus on large budget brand campaigns and premium performance campaigns that have always been our bread-and-butter business. ***It wasn't until very late in the quarter that we saw that our choice not to participate in some of these lower end performance segments, coupled with a few large brand deals that didn't materialize would moderate our revenue growth metric for the quarter.***

CEO Palmieri also announced that the Company had reached an agreement to acquire

Metaresolver, a mobile media buying and targeting platform, stating in part:

This small but strategic all cash acquisition will help us deliver additional programmatic buying solutions to advertisers and will enhance our ability to capture and analyze highly relevant data to produce better results for advertisers and developers.

56.     On February 20, 2013, prior to the opening of the markets, Millennial Media filed

its Annual Report for 2012 on Form 10-K with the SEC, which included substantially similar

financial results as those set forth in the Company's earlier press release. The Company's 2012

Annual Report also included certifications substantially similar to those described in paragraph 38.

57.    In fact, weaknesses in the Company's proprietary software and related technologies, including an inability to accurately track and report advertisement-related clicks and actions by users, had begun to erode customer confidence in Millennial Media's MYDAS system significantly prior to "very late in the [fourth] quarter," and the decline in revenue from the performance-advertisement segment was not, in fact, due to any "choice" on the part of the Company.  These and other technical problems, well known to Defendants but concealed from investors, were driving away CPC and CPA clients and delaying deals with CPM clients.

58.    In response to this partial disclosure of the effects of the flaws in the Company's proprietary software and related technologies on the Company's results and outlook, Millennial Media's stock price fell $5.38 per share, or 37.54 percent, to close at $8.95 per share following the trading session on February 20, 2013. However, the Company's stock price remained inflated because Defendants offered false and misleading explanations for, and continued to conceal, the true extent of the Company's problems.

59.    On April 5, 2013, Millennial Media issued a press release and filed a Current Report on Form 8-K with the SEC announcing the completion of the acquisition of Metaresolver for $14.0 million in cash. Millennial Media also announced a "streamlin[ing]" of the Company's management, including the termination of employment of Chris Brandenburg, the Company's Executive Vice President and Chief Technology Officer, and Stephen Root, the Company's Executive Vice President and principal operating officer.

60.    On May 8, 2013, after the markets had closed, the Company issued a press release announcing its results of operations for the first quarter of 2013. The Company reported revenue

of $49.4 million, gross margin of 41.6 percent, and more than 420 million monthly unique users

worldwide. The Company also offered revenue guidance for: (1) the second quarter of between

$58 million and $60 million; and (2) the full year 2013 of between $270 million and $280

million.

61.    In connection with these results, CEO Palmieri stated:

> We've gotten off to a solid start this year, with good growth
> and continued innovation. Usage of our platform continued
> to grow, with strong margins. We delivered a major new
> release of our SDKs, we closed on our acquisition in the
> programmatic mobile space, and we delivered financial
> performance consistent with or ahead of our prior guidance.

62.    Later that same day, Millennial Media hosted a conference call for investors and

analysts to discuss these results. As part of his prepared remarks, CEO Palmieri stated:

> Now on our last call, I talked about our areas of focus in
> 2013, and I would like to give you an update on our
> progress with each.
>
> These key areas of focus and investment in 2013 are critical
> to Millennial achieving its strategic goals. Our first area of
> focus for 2013 is to make it easier to buy and transact on
> our platform.
>
>         *        *        *
>
> The second area in making it easier for clients to buy and
> transact on the platform is programmatic buying and
> selling. We are determined to be a major player in premium
> programmatic media. We have made some aggressive
> moves in Q 1 to move in that direction, and we intend to
> invest and make more moves in the coming quarters. *It's
> important to note that our MYDAS platform operates via
> a real-time bidded marketplace, and has throughout our
> history, so adding the interfaces for the strategic and
> growing sales channel is an extension of the platform,
> and not a change to it.*

63.    On May 9, 2013, prior to the opening of the markets, Millennial Media filed its

quarterly report on Form 10-Q with the SEC, which included substantially similar financial

results as those set forth in the Company's earlier press release. The Company's Form 10-Q also included certifications substantially similar to those described in paragraph 38.

64.    On August 13, 2013, Millennial Media issued a press release announcing that the Company had reached an agreement to acquire Jumptap in a transaction that would be funded nearly entirely by 24.6 million shares of Millennial Media stock. Concurrently, the Company issued a press release announcing its results of operations for the second quarter of 2013. The Company reported revenue of $57 million, gross margin of 42.4 percent, and more than 450 million monthly unique users worldwide. The Company did not include guidance for the coming quarter or an update to its guidance for the full year in the press release in a manner consistent with prior practice, but rather directed investors to a presentation on its website and stated that guidance would be discussed on its earnings call that day.

65.    In connection with these results, CEO Palmieri stated:

> We had a solid growth quarter in 2Q with good showing in international and brand advertising. We had strong margins during the quarter with increased platform usage by some of the largest brand advertisers in the world. We are also very pleased to announce our acquisition of Jumptap and look forward to bringing our integrated capabilities to the global mobile advertising market.

66.    In connection with the earnings release, Millennial Media hosted a conference call to discuss its results with analysts and investors. As part of his prepared remarks, CEO Palmieri stated in part:

> Now turning to our future outlook, I'll share our thoughts regarding the third quarter and the full year 2013 based on information available to us as of today, August 13, 2013. Please keep in mind that in the near term our operations and financial results will be affected by acquisition and integration expenses, as well as any near-term market volatility we may face during the period between sign and close. Also, note that the future outlook we'll be giving today and moving forward will be on a pro forma combined

basis. We decided to give combined guidance, because it will be extremely difficult to separate the discussion of results for these two businesses on a going-forward basis in a relevant manner.

*        *        *

For the third quarter of 2013 we anticipate revenue on a pro forma combined basis to be in the range of $80 million to $85 million. We anticipate adjusted EBITDA to be in the range of a loss of $1 million to negative $2 million in the third quarter for the combined Company on a pro forma basis. For the full-year 2013, we anticipate revenue on a pro forma combined basis to be in the range of $340 million to $350 million. We anticipate adjusted EBITDA to be in the range of a loss of negative $1 million to positive $1 million for the full year on a pro forma combined basis.

Later, as part of the question-and-answer portion of the conference call, CEO Palmieri participated in the following exchange:

**[Analyst]**: This is maybe [the] second quarter out of the last three where you guys have missed your top-line guidance but come considerably in above the EBITDA guidance. Can you talk to us about the thought process behind that? *Because [it is] hard to believe that you could not have hit those revenue numbers and your EBITDA numbers had you been willing to forgo some of the EBITDA upside that we saw this quarter. Am I reading that the wrong way?*

**CEO Palmieri**: I think ... there's a lot of things that go into that. What I'll say is we're a growth company and we are very focused on growth. But *we've also been a company that's been somewhat conservative along the way in terms of our spending, as well.* So, I think the results that you see here are the best results that were available to us in the second quarter. I think the real interesting thing here is, this is a company that is near or at the top of growth rates for technology, media and telecom companies across the board. Yet we're shy on the revenue side of about $1 million again, as I said during the call, that's not lost on us that we should take this opportunity to be a bit more conservative on the revenue side.

67.     On August 14, 2013, prior to the opening of the markets, Millennial Media filed its quarterly report on Form 10-Q with the SEC, which included substantially similar financial results as those set forth in the Company's earlier press release. The Company's Form 10-Q also included certifications substantially similar to those described in paragraph 38.

68.     In fact, weaknesses in the Company's proprietary software and related technologies that Millennial Media claimed to be fully functional had both: (1) driven the Company to acquire Jumptap; and (2) continued to erode Millennial Media's customer base. The existence and extent of these technical problems were known to Defendants but concealed from investors.

69.     In response to this partial disclosure of the effects of the weaknesses in Millennial Media's proprietary software and related technologies on the Company's operational results and outlook, Millennial Media's stock price fell $1.60 per share, or 18.82 percent, to close at $6.90 per share following the trading session on August 14, 2013.  However, the Company's stock price remained inflated because Defendants offered false and misleading explanations for, and continued to conceal the true extent of, these problems.

70.     On November 6, 2013, Millennial Media issued a press release announcing the completion of its acquisition of Jumptap.

71.     On November 13, 2013, after the markets had closed, the Company issued a press release announcing its results of operations for the third quarter of 2013. The Company reported pro forma combined revenue of $86.3 million, pro forma combined gross margin of 38.6 percent, and more than 500 million monthly unique users worldwide on a non-combined basis. The Company also offered total pro forma combined revenue guidance for the fourth quarter of between $95 million and $100 million.

72.     In connection with these results, CEO Palmieri stated:

> We've made substantial progress building and strengthening our full-stack mobile advertising platform this year. Through our acquisition of Jumptap, the global launch of MMX, our mobile ad exchange, and the introduction of our Omni Measurement suite, we are uniquely positioned to be the partner of choice to the world's largest advertisers and agencies. In the third quarter we generated $86 million in combined pro forma revenues driven by strong brand and international results and growth in programmatic performance revenues via the newly acquired Jumptap capabilities. *Our integration is going well and we are very enthusiastic about bringing our combined capabilities to the global mobile advertising market.*

73.     Later that day, Millennial Media hosted a conference call for investors and analysts to discuss these results. As part of his prepared remarks, CEO Palmieri stated:

> 2013 has been a year where this industry has been in transition. In some cases, like the international or video opportunity, we were the first in line for new opportunities and, in many cases, the authors of change, flexing our competitive advantages in data and global scale. *In other cases, like addressing the growing importance of performance advertising and RTB buying capability, we saw a need to make big moves, to fill in real gaps, that represent key parts of the future of the platform.*
>
> *              *              *
>
> The market for performance business is moving rapidly towards programmatic buying and Jumptap's key real-time bidding capabilities are complementary to the platform.
>
> *              *              *
>
> As we move through the integration phase of this acquisition, we're even more excited about this combination than we were when we first announced the deal. *Our companies fit very well together, with complementary strength in both our capabilities and our cultures. Our teams are working very well together. The two companies are culturally similar and share a history of competing in the same space.* We're rapidly bringing

the companies together as one, and we're very impressed
with Jumptap's team.

74.     On November 14, 2013, prior to the opening of the markets, Millennial Media

filed its quarterly report on Form 10-Q with the SEC, which included substantially similar

financial results as those set forth in the Company's earlier press release. The Company's Form

10-Q also included certifications substantially similar to those described in paragraph 38.

75.     In response to this partial disclosure of the effect that ongoing weaknesses in the

Company's proprietary software and related technologies were having on its results and outlook,

Millennial Media's stock price fell $0.86 per share, or 11.98 percent, to close at $6.32 per share

on November 14, 2013.   However, the Company's stock price remained inflated because

Defendants offered false and misleading explanations for, and continued to conceal the true

extent of, these problems.

76.     On January 27, 2014, the Company issued a press release announcing preliminary

results for the fourth quarter of 2013. In connection with these preliminary results, CFO Avon

stated:

> We are very pleased with Millennial Media's strong fourth
> quarter performance. With the addition of Jumptap's
> capabilities we bring to market an expanded suite of
> offerings, delivering solid results for our brand and
> performance clients. *The integration plan is ahead of
> schedule, enabling us to complement our historical
> strength among brand advertisers with market leading
> solutions for our performance clients through our
> demand-side programmatic buying capabilities and our
> premium exchange (MMX)*. Millennial Media enters 2014
> with a much stronger and more comprehensive suite of
> capabilities than at this time last year positioning us well to
> capitalize on these assets in the year ahead.

The Company did not offer guidance for the coming quarter or full year in connection with its

earnings pre-announcement.

77. On January 30, 2014, Millennial Media filed a Form 8-K with the SEC setting forth its January 27, 2014 press release. Additionally, the Company disclosed that on January 25, 2014, CEO Palmieri had resigned from his roles as President and CEO of the Company and as a member of the Company's Board. Further, the Company revealed that the Board had appointed Michael Barrett as the Company's President and CEO, and had appointed CEO Barrett to the Board, effective January 25, 2014.

78. On February 19, 2014, after the markets had closed, the Company issued a press release announcing its results of operations for the fourth quarter and full year of 2013. The Company reported pro forma combined revenue in the fourth quarter of $109.5 million and pro forma combined gross margin of 38.2 percent. The Company's full-year results included pro forma combined revenue of $341.8 million and pro forma combined gross margin 39.4 percent.

79. Millennial Media further offered disappointing revenue guidance for the first quarter of 2014 of between $72 million and $76 million-far below analysts' expectations of $83 million. The Company also gave weak guidance for EBITDA of between - $5 million and -$6 million, sharply diverging from analysts' expectations of +$8.8 million.

80. In connection with these results, CFO Avon stated:

> Our fourth quarter success is a testament to the strategic decisions we made in 2013. From the acquisition of Jumptap, and our measured approach to integration, to the launch of our own mobile ad exchange, MMX, we have been able to innovate and execute on behalf of our clients. We are entering 2014 with a solid foundation to continue our growth in the coming months.

CEO Barrett added:

> I am delighted to join Millennial Media at such an exciting time. The Company has long led its industry; a fearless innovator with the technology and creative capabilities to match. I'm incredibly proud of what this Company has

achieved and look forward to pushing the limits as we grow.

81.   In connection with the earnings release, Millennial Media hosted a conference call to discuss its results with analysts and investors. As part of his prepared remarks, CEO Barrett stated in part:

> We are at an important and unique time in the evolution of the mobile advertising industry, and the same goes for our company. *As the industry is in the state of evolution, transition and growth, so is Millennial.*
>
>            \*      \*      \*
>
> In Q4 we delivered some very strong results, but we also had some revenue generation during the quarter, which is not likely to repeat in Q 1. *I believe this is a business that should grow its topline at 20% or maybe a bit more, based on where the market is today,* with some quarters growing faster and some quarters growing slower.

Later, as part of the question-and-answer session, CEO Barrett participated in the following exchange:

> **[Analyst]**: [J]umping in on the 20% general long-term revenue outlook. Most people probably think that the mobile industry is growing faster than that if you think about all of the different types of mobile ad product. *So does that imply that there are things happening out there that Millennial's not involved in* and could Millennial [] get involved in those to potentially grow even faster than 20%?
>
> **CEO Barrett**: As far as the annual guidance again, it is my choice as the new kid on the block that the direction we're going in this year is taking an overall look at both the market opportunities, with some of the capabilities we have, capabilities that we're building upon, and *we think that it's fair to say that this is a company we expect to have 20% growth this year.* I think that, that's all we can say about it at this juncture.

82.    In response to this partial disclosure that Millennial Media's proprietary software, related technologies and integration after the acquisition of Jumptap were far from the state of development that would allow the Company to grow at a rate commensurate with the balance of its own industry, but rather would require significant additional investment and development, and that the Company's corporate acquisitions had not filled the gaps in the Company's technology, Millennial Media's stock price fell $1.05 per share, or 14.58 percent, to close at $6.15 per share following the next trading session on February 20, 2014.

83.    On March 3, 2014, after the markets closed, Millennial Media filed its Annual Report on Form 10-K with the SEC, which included substantially similar financial results as those set forth in the Company's earlier press release. The Company's Form 10-K also included certifications substantially similar to those described in paragraph 38 executed by CEO Barrett and CFO Avon.

**D.    The Truth Is Revealed**

84.    Finally, on May 7, 2014, after the markets had closed, the Company issued a press release announcing its results of operations for the first quarter of 2014. The Company reported revenue of $72.6 million compared to analysts' expectations of $75.5 million. Additionally, Millennial Media gave dour revenue guidance for the second quarter of 2014 of between $70 million and $75 million, 22 percent below analysts' expectations of $96.4 million.

85.    In connection with these results, CEO Barrett stated:

> Now into my first full quarter, I am pleased with my decision to join Millennial Media and drive this Company to the next level. While I would have liked to have seen stronger performance in the quarter, we have developed an aggressive strategy and I have high confidence that we can execute and capitalize on the growth and promise of mobile.

32

Further, Millennial Media announced that CFO Avon would leave the Company "to pursue other career interests" at the end of the second quarter of 2014.

86. In connection with this earnings release, Millennial Media hosted a conference call to discuss its results with analysts and investors. As part of his prepared remarks, CEO Barrett stated in part:

> Based on what I have seen to this point, I'm enthusiastic ... [b]ut, I also realize that *we have some significant work to do*.
>
>           *         \*         \**
>
> [O]ur performance business, especially the app download business, was *down year-over-year and substantially from Q4, and these trends continue*.
>
>           *         \*         \**
>
> In late 2013, the team recognized the need to shift much of the performance business to what are called programmatic platforms. Through acquisitions, internal development and a big partnership last year, Millennial built out its programmatic platform. But *there is still work to be done to capture the benefits of the shift to programmatic*.
>
>           *         \*         \**
>
> By self-service interfaces and API's, performance advertisers can access Millennial's inventory, either directly or through a third party DSP. For Millennial, this is a much more efficient way to serve small and midsize performance advertisers, which will help us build a performance business that is based on many singles and doubles each quarter instead of being reliant on the home runs. But *shifting from this home run business, relying on big hits, spending a lot of money, to a more healthy longer-term business based on singles and doubles, is a shift that will take some time to work through*.

Later, as part of the question-and-answer session, CEO Barrett participated in the following exchange:

[**Analyst**]: I think last quarter you had talked about looking at kind of a 20 [percent] full-year growth rate. I guess, our assumption would be that that may change a little bit. And I apologize if I missed it, but I am just wondering if you are updating that view for the full year?

**CEO Barrett**: For the 20% outlook, I will address that right on. Because that was the guide-I said it, with the caveat that I was with the company for about 14 days. . . . *That guidance was loose.* It was kind of-we kind of expect it to grow in the 20% range. Brand was growing over 30%, and they expect it to grow so-at probably even at a faster rate in Q2. Performance is growing in the triple-digit area-I mean, I'm sorry platform is growing in the triple-digit area. *It is just that very difficult for me to sit here, and try to do the same loose guidance that I did in Q1.*

87.    On May 8, 2014, prior to the opening of the markets, Millennial Media filed its quarterly report on Form 10-Q with the SEC, which included substantially similar financial results as those set forth in the Company's earlier press release. The Company's Form 10-Q also included certifications substantially similar to those described in paragraph 38 executed by CEO Barrett and CFO Avon.

88.    In response to the full disclosure of the extent to which Millennial Media's proprietary software and related technologies required additional investment and development to allow for revenue and earnings growth, and that the Company's corporate acquisitions had failed to fill the gaps in the Company's technology, Millennial Media's stock price stock price fell sharply, declining $1.99 per share, or 37.20 percent, to close at $3.36 per share following the next trading session on May 8, 2014.

89.    Defendants' false statements and omissions during the Class Period caused the Company's stock to trade at artificially inflated prices during the Class Period.  However, as the conditions described above were revealed to the market, the Company's stock price fell by

$21.64 per share-or 86.56 percent-from its Class Period-high closing price of $25.00 per share on March 29, 2012.

90.    The true facts, which were known to, or recklessly disregarded by, Defendants and concealed from Millennial Media's shareholders and the investing public during the Class Period, were as follows:

(a)    technological products and services crucial to the Company's business model were not fully functional, but in fact were still in nascent stages when announced, leading to rushed, slipshod programming, poor performance, and failure;

(b)    the Company had little meaningful ability to track and report end-user clicks, leading to significant over-billing, which in turn led the Company's core customers to abandon Millennial Media;

(c)    corporate acquisitions that Millennial Media undertook during the Class Period did not offer the business synergies claimed by the Company, but were rather undertaken to fill gaping holes in the Company's capabilities;

(d)    corporate acquisitions that Millennial Media undertook during the Class Period were misrepresented as progressing well through integration, when, in fact, the Company faced insurmountable integration challenges stemming from its own prior rushed and slipshod development; and

(e)    Defendants' statements regarding the outlook and prospects of the Company were materially false at all relevant times.

## VI.    PLAINTIFF'S CLASS ACTION ALLEGATIONS

91.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or

otherwise acquired Millennial Media securities traded on the NYSE during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are all Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

92.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Millennial Media securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Millennial Media or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

93.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

94.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

95.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

36

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Millennial Media;

- whether the Individual Defendants caused Millennial Media to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Millennial Media securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and,

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

96.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

97.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Millennial Media securities are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased and/or sold Millennial Media securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

98.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

99.     Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Against All Defendants

100.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

101.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

102.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to

defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Millennial Media securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Millennial Media securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

103. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Millennial Media securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Millennial Media's finances and business prospects.

104. By virtue of their positions at Millennial Media, the Individual Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, the Individual Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to the Individual Defendants. Said acts and omissions of the Individual Defendants were committed

willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

105. Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of Millennial Media securities from their personal portfolios.

106. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Millennial Media, the Individual Defendants had knowledge of the details of Millennial Media's internal affairs.

107. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Millennial Media. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Millennial Media's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price for Millennial Media's securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Millennial Media's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Millennial Media securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged upon the revelation of the alleged corrective disclosures.

108.   During the Class Period, Millennial Media's securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Millennial Media securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Millennial Media securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Millennial Media's securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

109.   By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

110.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### Violation of Section 20(a) of
### The Exchange Act Against The Individual Defendants

111.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

112.    During the Class Period, the Individual Defendants participated in the operation and management of Millennial Media, and conducted and participated, directly and indirectly, in the conduct of Millennial Media's business affairs.  Because of their senior positions, they knew the adverse non-public information regarding Millennial Media's business practices.

113.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Millennial Media's financial condition and results of operations, and to correct promptly any public statements issued by Millennial Media which had become materially false or misleading.

114.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Millennial Media disseminated in the marketplace during the Class Period.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Millennial Media to engage in the wrongful acts complained of herein.  The Individual Defendants therefore, were "controlling persons" of Millennial Media within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Millennial Media securities.

115.    Each of the Individual Defendants, therefore, acted as a controlling person of Millennial Media.  By reason of their senior management positions and/or being directors of Millennial Media, each of the Individual Defendants had the power to direct the actions of, and

42

exercised the same to cause, Millennial Media to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Millennial Media and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

116.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Millennial Media.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.   Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.   Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.   Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.   Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:   October 17, 2014

Respectfully submitted,

POMERANTZ LLP

Jeremy A. Lieberman
Francis P. McConville
600 Third Avenue, 20th Floor
New York, New York 10016

Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
         fmcconville@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.   I,   _Travis Ostrough_   , make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2. I have reviewed a Complaint against Millennial Media, Inc. ("Millennial" or the "Company"), and authorize the filing of a comparable complaint on my behalf.

3. I did not purchase or acquire Millennial securities at the direction of plaintiff's counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4. I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired Millennial securities during the class period, including providing testimony at deposition and trial, if necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5. To the best of my current knowledge, the attached sheet lists all of my transactions in Millennial securities during the Class Period as specified in the Complaint.

6. During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7. I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.   I declare under penalty of perjury that the foregoing is true and correct.


Executed _____10-3-2014_____
              (Date)



                                        _____
                                                (Signature)

                                        _____
                                            (Type or Print Name)

**MILLENNIAL MEDIA INC, (MM)**                    **Ostroviak, Travis**

## LIST OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|------|------------------|-------------------|-----------------|
| 10/22/2013 | PUR | 2,800 | $6.8600 |
| 11/08/2013 | SAL | 630 | $7.0926 |
| 11/20/2013 | PUR | 320 | $6.2771 |
| 11/25/2013 | PUR | 260 | $6.2765 |
| 11/26/2013 | SAL | 150 | $6.2533 |
| 12/04/2013 | SAL | 2,600 | $6.1922 |
| 01/08/2014 | PUR | 1,200 | $7.3783 |
| 01/13/2014 | PUR | 300 | $7.3300 |
| 02/05/2014 | PUR | 428 | $6.9866 |

ostroviak